Good morning, and may it please the Court, Natalie Ram for the appellant Stephanie B. Green. The District Court here made three distinct legal errors. First, it failed to apply the law for determining whether defendants' explanations were pretextual. Second, the District Court ignored reams of contrary evidence and might well have come to a different conclusion had it considered that evidence. And third, the District Court incorrectly concluded that removal from elected union office is not discipline under federal labor law. Each of these errors requires reversal and remand. The Supreme Court has instructed that after a bench trial, reversal and remand is appropriate where the findings are infirmed because of an erroneous view of the law or where the District Court failed to consider relevant evidence and might have come to a different conclusion had it considered that evidence. So you have the failure to dismiss first, and then you have the bench trial after. So we've got sort of different standards of review that we're talking about on those. I'm actually interested, probably most interested, in the dismissal of the 609 claim because I think that we have to do statutory construction on that. And it would seem to me that while I think parties argue that there are, that's probably a first impression in terms of the Section 609. Yes, Your Honor. That's a question that this Court has opened to it following the Supreme Court's decisions in Lynn, which we think compels the conclusion that discipline, in fact, includes removal from elected union office. Lynn stated that LMRDA's basic objective is to ensure that unions are democratically governed and responsive to the will of their memberships. And in Brininger, the Supreme Court also stated that discipline, which is the key word in Section 609, includes actions taken to protect the interests of the union or its membership. Don't Finnegan and Lynn provide conflicting guidance for us? And so we've just got to get back, we just have to do basic statutory construction here. I think that's correct, Your Honor. What Finnegan said is that appointed union office is not protected either by Section 101 enforced through Section 102 or through Section 609. Lynn, however, after Finnegan, came along and said the rule is different for when we have elected union officers. And that's because protecting elected union officers enhances the democracy in a union local or in a union. And that that is substantially different from appointed union office where we're concerned about patronage and allowing a newly elected set of union officials work with people that they know and trust. And like in Lynn, we believe that elected union officials under Section 609, that protection for those officials is essential for the same reasons, that it's essential to protect and ensure that unions are democratically governed and responsive to the will of their memberships. That's the LMRDA's basic objective. And that's what we think protection for elected union officers requires in this case. Now, I'd like also to point out that this is a question, again, that this Court hasn't answered, that this is not a question that the Court has decided. And, in fact, Lynn specifically identified this question as a question that it was not answering and that it was leaving open. And we think that it's appropriate for this Court, in this instance, to recognize that protection for removal from elected office violates Section 609, and to reverse, therefore, the district court's decision in that manner and remand it to the district court for further proceedings. Well, is there, okay, there's not a lot of legislative history in 609. There seems to be more in 101A5, which could arguably be instructive. So what's, how, without a lot of legislative history on 609, how are you, you know, write the opinion for me. I think the opinion would state that Lynn explained that the LMRDA's basic objective is to enhance union democracy, that protecting elected officials enhances that democracy, and that, therefore, protecting elected officials is important in this instance through Section 609 from unnecessary and unlawful discipline. And the discipline includes removal from elected union office. After all, there's no more official action than removal from office by means of an administratorship. That's the international coming into the local and removing the president and other officers from the local. And that's an official action. That's an action that the union would presumably assert protects the interests of the union or its membership. But here it's a perversion of that interest because it's acting against the interests of the union and its membership in its choice of elected official. Well, I think it probably wouldn't come as a surprise to you. You sat through the last case, and now we're all sitting through this case, that union members just aren't all of the same mind, and they aren't all of the same tactics all the time. And so, you know, essentially I think you have in both situations courts saying, you know, this is an issue of people either behaving badly or, you know, fractious, you know, groups in both of the unions, and we're just not, you know, we're not going to go there on that. How do you respond to that? Well, I think at a minimum that what the district court did here was not enough to assure this court that the district court was correctly applying and evaluating the relevant evidence under the correct legal framework. So what we have here is a substantial amount of pretext, of evidence of pretext. So now you're really going, though, to the bench trial, right? Yes. And in the bench trial there was, and so I guess in terms of when you're reviewing what happens in a trial, whether it's a jury or whether it's a judge, there, you know, there was, you presented evidence of that it was because she was a woman and because she was African American. They presented evidence to the contrary, and you, you know, presented some evidence of pretext as it were, but the court just found one part of the evidence more persuasive than the other, and I think ultimately said that it was just, this is union fractious behavior, and it wasn't because she was a woman and a minority, right? Well, what the district court said was not enough. That's, that's our essential point, that there was evidence of pretext, and the district court appeared not even to recognize that it was evidence. Right, that if it had been summary judgment and they'd kicked you out on summary judgment, then I'd probably agree with you, but when you actually go to a trial and the court's actually weighing the evidence and considering it, why can't the district court put more weight on one than the other? Well, there are two reasons. First, that the Supreme Court said in Pullman's standard that where a district court ignores substantial evidence, substantial relevant evidence, and we believe that's what occurred here, and that its decision might have been different had it considered that evidence. That's sufficient for reversal and remand. How can we know, you made this contention several times, how can we know that the district court ignored evidence? Did he say, I'm ignoring the plaintiff's case or something like that? Well, the district court both decontextualized relevant evidence of pretext and also ignored and did not mention relevant evidence of pretext. Well, not mentioning it is not the same as ignoring it. In other words, you know, if the judge sat there and heard the evidence, I mean, isn't there a presumption that it's being considered just at the moment it's being rendered? Well, this court has said that in discrimination cases, that in order for this court to understand the basis of the district court's opinion, that requires the district court to make factual findings that respond to the proper order of proof as established under McDonnell Douglas, which has as its third step assessment of whether a pretext has been shown. And here, the district court simply didn't evaluate whether there was evidence of pretext. It ignored all of that evidence of pretext. And I'd like to take you through that. But the thing is that I guess what I'm saying, if you heard it to tell me that someone ignored it, then tell me that they said, I'm not going to listen. You know, they're plugging their ears. I'm not going to hear anything about this. You know, not believing something or not feeling that it has the same weight that you're asking is not the same as ignoring something. Well, we're simply asking this court to apply ordinary rules of law, and that requires that where the district court fails to provide findings that assure this court that it has applied the correct legal framework, that it's appropriate to reverse and remand to the district court to make the missing findings. And here, the district court simply didn't engage with evidence of pretext as pretext. In fact, it looks, from the district court's opinion, like the district court didn't engage with that evidence at all. For instance. But you're turning standards of review on their head. I mean, for example, with a jury or a judge, particularly with a judge, it is presumed that the judge applied the correct law. So unless you can point to something in the record and saying, I don't like McDonnell Douglas, I don't want to do this, and I am specifically not going to listen to anything on pretext, how, you know, I think all the presumptions after a trial are against you. Well, we believe that it's evident from the district court's opinion that the district court did not apply the McDonnell Douglas framework. And certainly, at a minimum, the district court didn't make factual findings. Did someone argue McDonnell Douglas down in front of the district court? Before the district court, it was argued that the reasons provided for the stated action were not true reasons. And that corresponds to the pretext step of McDonnell Douglas. And this court has said in Weber v. Nicholson that in discrimination cases, in order for this court to understand the basis. So there were arguments of the correct law. The court just didn't buy it. They didn't apply an incorrect. They didn't apply that. They just said, I don't, the court just said, I don't think this happened to her because she was African American or because she was a woman. I just think that these people were all fighting and it was an ideological battle. And even if a stray remark was made that had a racial overtone, I think the person that made the most offensive remark, my recollection is that person was a subordinate. That person was a staff representative of the local. But she was at the center of a lot of the challenged conduct in this case. And so her statement is relevant, particularly given the fact that this court has said that where there's direct evidence of discriminatory animus in the record, that it's reasonable to attribute later conduct by that same individual to that same discriminatory animus. Is that the same person, though, that made the decision, the adverse decision on your client? Well, that individual worked in concert with members of the international in order to discriminate against my client and in order to suppress her dissent culminating in the administratorship. That that individual was at the center of a lot of the challenged conduct here and that that's relevant. And what the district court said about that comment, it noted that there had been a comment, but it didn't note who had said it, and that's relevant. And it didn't note that the person who had said it was at the center of all of this challenged conduct, which was really in the heart of what was going on. And the district court ---- Excuse me, counsel. Weren't there several people involved in the turmoil in the union? There was ongoing fighting back and forth. And the trial judge said, you know, they had to have this administrative unit because there was just too much conflict there. Someone had to step in. He didn't ignore the offensive statement, but he just said there was just tremendous evidence of turmoil. And that's really the reason that it happened. Well, what the district court did was identify that there was a statement. But, again, the district court didn't set that in context so that we can understand whether or not the district court correctly identified that that was, in fact, evidence that further conduct by that individual, an individual she worked in concert with, might also have been driven by discriminatory animus. That's the heart of our claim is that the district court simply didn't do enough here to give this court the assurance that it needs to conclude that the district court, in fact, applied the correct legal standards. But you're not asking us to send it back for findings. You're asking us to reverse it, right? We're asking for reversal and remand. We're asking that it be sent back to the district court so that the district court can do its job properly in the first instance ---- do its job properly. That is that the district court can either conduct a new trial and prepare a new opinion. The district court might also take the record as it stands and prepare a new opinion on that basis. So we think additional evidence might well be helpful. What's your best case to say you're entitled to these findings that you want? In Weber v. Nicholson, which is a 2007 case from this court, this court reversed for inadequate findings after a bench trial, so it's on a similar procedural posture. And the court there stated, and I've said it several times, but please indulge me in stating it again, in discrimination cases we have clarified that, quote, understanding the basis of a decision requires the district court findings respond to the proper order of proof as established under McDonnell-Douglas. No, I admire your pluck not to be derailed. And that has as its third step that the district court has to expressly consider evidence of pretext as pretext and state, I understand that pretext can be established in various ways. It was not established here or it was established here. And the district court simply didn't do enough in this instance to assure this court that it was doing its job properly. All right, do you want to save the balance? Yes, I would. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Danielle Leonard on behalf of the United Steelworkers of America. And as I previously stated, 10 minutes for you and 10 minutes for Mr. Hudson-Buehler. Mr. Hudson-Buehler, correct. I will keep this brief because I believe Your Honors have covered much of what our primary argument is with respect to why the district court has not been able to do enough and why the district court's factual findings are absolutely correct and why there was no clear error here, which is what the plaintiff needed to show with respect to the conclusion that the international's actions were not improperly motivated. Are you going to be talking about Section 609? I will, and I'm happy to discuss that first if Your Honor. Well, if we disagree with, say, if we were to disagree with your Section 609 arguments and find the district court improperly dismissed the claim, why shouldn't we remand for further proceedings on that cause of action? Because it's harmless error, Your Honor. Because the plaintiff litigated to the conclusion her claim under Sections 101A1 and 2, which are enforceable via Section 102 of the LMRDA, in which she claimed that the international union took actions against her as a result of her speech. And the district court found, as a matter of fact, that none of the international's actions were because of the plaintiff's speech. That factual finding and conclusion is absolutely conclusive with respect to her 609 claim. This is the model of harmless error. She's saying you dismissed one of my claims out early, I should get another shot at that. But when, in fact, the factual findings made at trial, which are predicated on exactly the same issue under 609, she's saying unlawfully disciplined because of my speech, the same speech that the district court rejected at trial. That's harmless error. There's absolutely no reason to even reach the 609 issue because of those factual findings. In order to prove her 609 claim, she would have to show that the international's actions were because of her speech, and that's exactly what the district court rejected. All right. You kind of anticipated my question then. In other words, well, let me put it this way. If we decide, you know, the trial claims, right, in your favor, in other words, if we affirm the trial court on the trial after judgment, then you're saying we don't even have to decide the 609 issue, do we? That's correct. Because we can assume that even if the plaintiff is correct on her interpretation of 609, it's harmless error anyway, so we don't have to decide it. That's right. Because one of the other elements of 609 is something that the district court has foreclosed by conclusively finding that the international's actions were not because of plaintiff's speech. And the plaintiff has come here today, as the preceding argument demonstrated, with an argument that the district court, in this case, after a 10-day bench trial, in which every single piece of evidence was admitted, not excluded, nothing was ruled irrelevant, in which he stated in his opinion that he carefully considered all of Ms. Greene's evidence, including Ms. Greene's evidence. On page 3, the district court states he considered Ms. Greene's evidence for the other reasons for the international's actions, which is what she's – when she's talking about pretext. Let me make an argument for the plaintiff, her appellant here. Let's see. I mean, there are a number of facts that, when taken together, can be construed to point to some sort of discriminatory or retaliatory animus on the part of defendants. For example, contrary to her predecessor, Ms. Greene was informed she would serve as steward for only one building as opposed to the entire K Basin. She wasn't given an office. She did not initially have signature authority. And she was eventually removed from office via the administratorship. Why aren't these facts sufficient to justify a finding that the district court clearly aired? So I'm kind of saying more – she didn't say this, but she's almost arguing a sufficiency of evidence. The reason for that, the short answer, and then I'll address each of those specific pieces of evidence. Since I kind of was rigorous with her, you know, I'm going to construe her argument in what I consider to be the most favorable for her. No, and I appreciate that, Your Honor. The short answer is where there are two – this is all circumstantial evidence, and where there are competing versions about the inferences and conclusions to be drawn that are plausible from the circumstantial evidence, the trial court's judgment as to the reasons for the international actions stance. That is not a clearly erroneous finding, unless there is directly contradictory evidence that undermines a factual finding, or unless those factual findings, as the Supreme Court said in Anderson, particularly where those factual findings resulted from crediting the testimony of the international's employees, those factual findings stand. It is – the Supreme Court said this. It is virtually impossible where those factual findings resulted from crediting the testimony, which is what the district court said here. He considered the testimony of Mr. Mackey, Mr. Bonds. He considered Green's arguments, and he simply did not agree that the evidence showed that the international's actions were improper. And that leads me to the specific pieces of evidence that Your Honor has pointed to. The last is the only piece of evidence that's actually connected to the international union at all. What we've got in these briefs is a, you know, throw the darts. We've got – let's combine everything we possibly can, involving a lot – a huge cast of characters, and say it's, you know, concerted effort and conspiracy on behalf of all these different characters, from the subordinate that Your Honor was talking about earlier to the highest levels of the international union. And Ms. Green's argument is the only possible explanation for all of their actions is discrimination. That's simply not true, and it's not what the district court found. Well, you know what bothered me was Terry Bonds knew when he emailed President Girard that Green did not force the local not to defend her EEOC charges, but he didn't mention this error. Isn't that evidence of prejudice? It is not, Your Honor. And it's actually – that's a characterization that's in the plaintiff's brief that's not true, and it's not actually reflected in the record or the evidence. The record evidence demonstrated that the local union did vote and did have a motion not to pay for the defense of the earlier EEOC claim. And the earlier EEOC claim – But the vote was not to not defend. It was not to pay the bills. It was not to pay the bills. That's correct. So in expressing that to Mr. Girard, there's nothing inconsistent with the reasons for imposing the administratorship. And the crucial point here is the district court considered that. This argument that he ignored the evidence is simply wrong. He considered that evidence, and Ms. Green argued it below. And he held that the reasons given by Mr. Bonds combined with the longstanding history of turmoil and factionalism and dysfunction in this local union were more than sufficient to justify the international's actions and that those actions were not the result of any concern with race or gender or the suppression of speech. This was an action targeted at reforming and improving this local so that it could serve the interests of all of its members, not just the members represented by the faction that supported Ms. Green, but all of its members, which was a serious concern and problem. That's what the evidence showed, not discrimination. And that's what the district court held. And Ms. Green has not even come close to demonstrating to this court that those factual findings, specific factual findings, are clearly erroneous. Well, on 609, in interpreting 609, and I mentioned this to your two appellants counsel, Ms. Ram, that there's some tension between Lynn and Finnegan, and the Supreme Court hasn't exactly answered this question. And admittedly, it's a first impression to the Ninth Circuit. And do we have other circuits that have answered this question? And if so, you know, generally speaking as an intermediate appellate court, you like to interpret Supreme Court precedent in a way that you feel would be consistent that the way that they would do so rather than to be wrong. And so what sort of guidance do we have in this from other circuits? Or just in terms of, it's not completely easy. I do believe there's some tension. I think that these decisions can be reconciled, however, and that the way to reconcile them is the way that the district court reconciled them. There is a Third Circuit case that was cited with approval in Finnegan, which held that Section 609 does not apply to removals from elected office. And we know Finnegan was about removals from appointed office. But the Supreme Court did cite favorably Third Circuit decisions. So what you're saying is that they knew that, and if they wanted, but they didn't say anything. They didn't overrule it, but they didn't specifically. That is correct. I think the key is actually to take it back to this question of statutory interpretation is to look at the language of the statute and the legislative history, as Your Honor was indicating in your colloquy with Ms. Ram. And the key in Finnegan is the legislative history of Section 101A5, which uses the same fine, suspend, expel, or otherwise discipline language as Section 609. You cannot, under Supreme Court precedent, interpret. There's no reason to interpret those sections differently, and the Supreme Court indeed has said that you shouldn't interpret those two sections. The same language consistently in the LMRDA. Recognizing that the LMRDA is maybe not necessarily a model of legislative drafting, that language should be interpreted consistently. And the legislative history cited at page 438 of Finnegan states conclusively that Section 101A5 was not intended to apply discipline, was not intended to apply to the removal of union officers from office. All right. Well, I'm going to give the time to Mr. Hudson-Buehler at this time. Thank you. And I'll put it back to Tim for him. Thank you. Thank you for your argument. Good morning. Good morning. Thank you, Your Honor. May it please the Court, my name is Daniel Hudson-Buehler with Robley, Detweiler & Black, attorneys for the Hanford Atomic Metal Trades Council, or HAMTAC as I'll refer to it today, and Dave and Jill Molna. HAMTAC is an umbrella labor organization comprised of 15 affiliate unions that represent workers at the Hanford nuclear site near the Tri-Cities here in Washington. And it's overseen by its president, Dave Molna, who's been president throughout the times relevant to all the issues here. I think I will start with the 609 issue because it seems to be something of interest to the Court. In her opening brief, the plaintiff focuses the entirety of her argument with regard to 609 on her removal from office. We've had a trial in this matter. The only time she was actually removed from office is after the Mackey Commission by the International. There's no allegation or evidence that Mr. Molna or HAMTAC was in any way involved in that, and there's no mention of HAMTAC in her briefing with regard to the 609, at least in her opening brief, with regard to Section 609. Now, the plaintiff argued in reply that Molna's decision not to recognize her signature authority constituted an effective removal from office. Again, nothing in the plaintiff's opening brief says anything about the denial of signature authority being an effective removal. This Court has held that the failure to address an issue in opening brief constitutes a waiver. This is a matter of interest. What possible why would it matter whether Green was an employee of the local bar for the purposes of granting her signature authority? What would be the explanation for that? Mr. Molna's explanation was historically, now again, there's 15 affiliates that he deals with as president of HAMTAC, and historically at 12369, the people with signature authority, those that ran the local. Staff people. Staff representatives. They're employees specifically by the local to represent the membership and to enforce agreements and things like that. For the most part, most of those people also happened to be president at the time that they were staff representatives. But what difference does it make? Well. Just because it was in the past. If you have a president, you have a president. Well, right. But there was one president, Clyde Thorndike, a white male who did not have signature authority because he was not also a staff representative. The way that this local union operated, and I think others within HAMTAC, and the record reflects this, there are differences between a president and between a staff representative or a business manager. Those people hired and paid directly by the local, those are the people that are in charge of running the local's day-to-day business. The president had historically, the role of president historically was more running the meetings and things of that nature. It was the people with the staff representative title and position that actually had the authority. But that was changed. Well, ultimately, yes. Yes. Yes. But at the time that Ms. Green initially was elected president, Molna was continuing along with, as he understood it, the authority that resided in the office of the presidency versus the authority that resided with the staff representative. I understand the explanation. I just couldn't see why. But anyway. I mean, it's sort of like everyone said, that the unions say that they want to run their own business, and it's like your children saying they want to run their own lives, and then everyone behaves badly. You know, that's, you know, that, I mean, we have to look to other things in terms of this, but it just doesn't, you know, I have to agree with my colleague here a little bit that it just, some of these things seem so petty. I think that's a good word for it. And I think that's probably accurate in light of the record as a whole. But simply because something was petty, I don't believe that that means that a finding that the decision was not discriminatory or made with a discriminatory basis. That doesn't make it clearly erroneous. And I think that's the important thing to remember. There was clearly fighting amongst all the parties involved. Yeah, they seemed to give sort of like hostile work environment at the max. Well, I think it was a lot of give and take on both ends, and I think that's ultimately. Let me ask you a couple of questions about this Kay Basin Steward position, why it changed or why it didn't change. I almost can't understand the district court's reasoning on that. He says, well, you know, it took time, it wasn't formal, but it doesn't explain why they discriminated against her, does it? It continued with the same old arrangement, you know, I mean with the old person doing the job that she was elected to do. Well, that steward position was a position that she was elected out of with the local. Hamtech, I don't believe, played any role in her position as Kay Basin Steward. I'm familiar with it just because I'm familiar with the case, but I don't know what role Hamtech played in that regard. I believe that was. So you're saying, all right, so your position, well, whatever went wrong with that, and maybe it was discriminatory, it's not my fault. Well, I don't believe MOLNA had any role in that whatsoever, or Hamtech itself. I believe it was an issue that the local, after she was elected to that position, there were allegations that the local changed that, and I don't believe it was ever brought even to Mr. MOLNA to try to resolve in any fashion. Well, you know the fact of that situation. How do you explain it? I believe, from my recollection, and this is just, again, not something that I was looking directly at, but I believe that was when Domino had previously been in the position of Kay Basin Steward and then it was divided into East and West, is that correct? I believe it was divided after the election, right? I believe so, but I believe, I thought ultimately that that was resolved in her favor by the International. But it took a long, long time. It did, and a lot of this stuff does take quite some time, especially when I think the record reflects that Ms. Green instituted a number of changes in kind of the way that things had operated in the past, and naturally I believe saw a lot of resistance to that. From the record as I see it, and I believe as the court side, I don't think that just because there was resistance to change, that that resistance can be attributed to a discriminatory animus or an intent to suppress dissent. I think the record clearly reflects, after 10 days of trial and after hundreds of exhibits, that the district court found credible the various explanations from the local, excuse me, the International and from Hamtech about why they took the actions that they did with regard to Ms. Green. I think if I can walk briefly through several of the issues, I'll kind of touch briefly again on signature authority. The judge's specific findings in that regard were that there was nothing improper about Molna's or Hamtech's motive on the issue of signature authority, and that the plaintiff's claim that she must be the sole local contact on Hamtech matters, simply by virtue of her presidency, was a startling and marked departure from the past. And I think the evidence showed Randy Knowles, Jim Watts, Karen Alexander, Jim Orozco, all staff representatives who had signature authority. They were full-time employees of the local. And as I mentioned earlier, the one other individual who was a president of the local, Clyde Thorndike, served temporarily as president, but he did not serve as a staff representative. He was a white male, and he did not have signature authority. While it may have been not an ideal decision, looking back, I don't think that there's anything in the record that reflects that it was in any way made in a discriminatory fashion. I did want to address also Randy Knowles. I think there was some discussion in the briefing about him having been past president and staff representative, but signing over the word president. I think the record clearly reflects that Mr. Molna explained he didn't care what somebody signed over. He cared what their actual authority was, and that actual authority was that of a staff representative. I think I touched on the 609 issue. I think there are additional grounds for affirmance. As I talked about at the outset, Hantech is an umbrella labor organization with 15 affiliates. Those labor unions represent individuals. Those individuals, like the plaintiff, pay their dues to their respective unions, and I believe are members under the LMRDA and LMRA of those unions, not of Hantech. And without being a member of Hantech under either of those statutes, I don't think she has a cause of action. Even if she could state a cause of action under the LMRA, her claim for breach of Hantech's bylaws with regard to the signature authority issue is barred by the statute of limitations. There's a six-month statute of limitations that applies to claims under the LMRA. The plaintiff filed this lawsuit in November 2007. The signature authority issue was resolved in January of 2007. And with that, if you don't have any further questions for me, I will. We do not appear to have any further questions. Thank you very much for your time. You have no time. Do you have any objection? All right, 30 seconds. Thank you. Judge Tshishima asked. Show on the record where we should look. Just tell us. It's page 5 of the district court's opinion with respect to the resolution of the Kaye Basin Steward issue. The international did not resolve that issue, as Mr. Hudson-Byler stated. The international had nothing to do with the resolution of the Kaye Basin Steward issue. That was all underneath the local before the merger. So you became Hudson-Byler when you said it wrong. Can I just ask one question? Yes, you can. When you say page 5, you mean ER 5 or 5 of the, you know, the documents? I believe it's ER 11. It's page 5 of the documents. All right, thank you. All right, thank you. Go ahead. Thank you, Your Honor. I want to make three points. The first is that, as you correctly noted, there is a lot of evidence that suggests unsavory motives, to say the least in this case, and that the district court at bottom really didn't deal with that evidence as evidence of pretext. So very briefly, with respect to signature authority, that's a rule that nobody had ever heard of, that Mr. Molna had never applied to anyone, and appears to have applied this rule only to the disadvantage of Ms. Green, and that's the only person who has ever been denied signature authority. What about the temporary president who was white? Yeah, Clyde Thorndike was a temporary president. He was not an elected president, and so he filled that role for, I believe, less than a year. And so his status was quite different from the status of other presidents of the local, and we don't think that that's indicative of the appropriate rule or indication that there was, in fact, any rule. I also want to touch briefly on the Kay Basin situation, because I think that it demonstrates exactly what the district court didn't do in this case. The district court made a finding that said that what happened with Kay Basin was okay because of a lack of formality. And this court has said that where an entity takes adverse action against an individual based on a supposed policy that's unwritten or inconsistently applied, that that's evidence that there isn't a policy and that it's just a mask, an excuse for unlawful discrimination. And here the district court found that everything was okay because of an unwritten, unknown, brand-new situation. And that's, in fact, evidence that not everything was okay, that not everything was okay. And so the fact that the district court found everything was okay for a reason for thinking the opposite is telling. I also want to note that the international disclaims liability. We think that that's incorrect because the relationship between this international and this local was very close, much closer and much more intersecting than is the case normally. We have testimony from international employees that say, that confirms that Ms. Green spoke with them much more frequently and that she, in fact, linked the trouble that she was having with the executive board to being a single mother, black female. That was the testimony at trial. And we think that although ratification is hard to demonstrate, that it is, in fact, demonstrated here, where the international was deeply involved in a lot of the goings-on in this local. We also want to point out that even if the district court's findings might merit, that even if, that so long as discrimination was a motivating factor in the challenge conduct that we discussed at trial, that that is sufficient to make a claim and entitle Ms. Green to a finding of liability. Well, I agree with you on that, but that would be like, for example, if they were appealing, the bench trial, and they said there was insufficient evidence to support what the trial judge, then I would say you've made a correct statement of the law. And so had you won there and they made that argument, I might be saying the same thing to them, what I'm saying to you. Well, again, we think that the district court's findings in this case take insufficient account of the relevant evidence of pretext and fail to make the necessary findings to assure this court that the district court properly discharged its responsibility to evaluate the relevant evidence under the correct legal framework, and that because mixed motives still provide for a finding of liability, perhaps if not damages, although we think damages would also be appropriate, that the reversal in remand is appropriate here. I just want to touch finally on the 609 issue. And the attorney for the International noted that the Supreme Court in Finnegan identified a Third Circuit case. That's a case in which the Third Circuit in fact stated that I believe that the court in the Third Circuit there stated that officers were excluded from all of the protections of Title I, and Lynn clearly states that that is not the case, that officers are protected, that they have free speech rights, elected officers that are protected just the same as rank-and-file members. And so we don't think that that's an appropriate basis for this court to make its decision and that we think it's appropriate to remand that piece of the case and indeed to remand the case as a whole. Do you agree with the harmless error argument that if the union wins on the trial claims, then we don't even have to reach the 609 issue because it's harmless error? Well, we think it would be most appropriate to remand that issue to the district court to determine whether further evidence would be helpful with respect to the 609 issue in particular. But it's the same facts, isn't it? It's the same, you know, it's based upon the same, you know, series of happenings. That's correct, Your Honor. But anyway, you think it should be remanded. We do. We think that the case as a whole should be remanded and that at a minimum the 609 claim should be remanded as well. Well, thank you all for your argument. I think that was a well-argued case and we appreciate your pro bono representation as well. And this matter will stand submitted.
judges: Nelson, Tashima, Callahan